## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Lynda Calderon, individually and on
behalf of all others similarly situated,

Plaintiff,

v.

The Procter & Gamble Company,

Defendant.

Case No. 22-cv-3326

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff, Lynda Calderon, brings this putative class action against Defendant, The Procter & Gamble Company, alleging that P&G's melatonin supplements contain significantly more melatonin than stated on the products' label. Calderon claims this violates state consumer protection laws. Defendant moves to dismiss the complaint, arguing preemption and lack of standing, as well as failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated herein, Defendant's Motion to Dismiss [27] is granted in part and denied in part.

### I.   Background

The following factual allegations taken from the operative complaint (Dkt. 22) are accepted as true for the purposes of the motion to dismiss. *See Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021).

Melatonin is a neurohormone that regulates the brain's sleep cycle. Dkt. 22 at ¶ 1. Millions of consumers take over-the-counter melatonin supplements to help them sleep. *Id*. Procter & Gamble's (P&G) Vicks Pure Zzzs is a major U.S. brand of

1

melatonin supplements, sold at retailers nationwide. *Id*. at ¶ 3. P&G makes and sells several varieties of Pure Zzzs Melatonin. *Id*. at ¶ 16. For each product, the label claims a specific amount of melatonin per serving. *Id*.

Federal law regulates dietary supplements, including melatonin supplements. *See generally* FDCA, 21 U.S.C. § 301 et seq. Under applicable U.S. Food and Drug Administration (FDA) regulations, melatonin qualifies as an "other dietary ingredient," meaning that the quantity of melatonin in a supplement must be listed on the product label. 21 C.F.R. § 101.36(b)(3)(i). Because some supplements like melatonin degrade over time, FDA regulations state that "reasonable excesses over labeled amounts are acceptable within current good manufacturing practice." 21 C.F.R. § 101.36(f)(1). A manufacturer can add enough melatonin so that the dosage "meets the amount specified on the label throughout the product's shelf life." Current Good Manufacturing Practice in Manufacturing, Packaging, Labeling, or Holding Operations for Dietary Supplements, 72 Fed. Reg. 34752, 34884 (June 25, 2007); Dkt. 22 at ¶ 21. But a manufacturer cannot add "excess dietary ingredients in unspecified amounts that would be in excess of the amount actually needed to meet the label declaration." *Id*. An excess is not a "reasonable excess" if it is materially more than necessary to meet the amount specified on the label throughout the product's shelf life. Dkt. 22 at ¶ 21.

In approximately 2020, Calderon bought a bottle of Pure Zzzs Nightly Sleep at a Target or Walgreens in Chicago. *Id*. at ¶ 37. Trusting the accuracy of the labeling and because she was buying a melatonin supplement that could alter brain chemistry,

2

Calderon relied on the fact that P&G's actual dosage would match the recommended dosages. *Id*. at ¶¶ 4, 37. Calderon read and relied on the accuracy of the melatonin content on the label in deciding to buy the product. *Id*. She says she would not have purchased the product, at the price she paid, if she knew that P&G was adding an unspecified amount of melatonin in excess of the amount needed to meet the label claims. *Id*. ¶ 37. She says the product is now worthless to her. *Id*. In addition, Calderon experienced adverse side effects including grogginess and headaches. *Id*. She suffered economic injury in the price premium she paid for the product, which, because of its inaccurate dosing and labeling, is substantially less valuable. *Id*.

To determine how much melatonin is in Pure Zzzs, a university mass-spectrometry laboratory tested bottles of Pure Zzzs, including Calderon's bottle. *Id*. at ¶ 4. The products tested were the Pure Zzzs Melatonin + Chamomile & Lavender Gummies and the Pure Zzzs Nightly Sleep Tablets. *Id*. at ¶ 18. The results showed that the bottles were overdosed. *Id*. at ¶¶ 18-20. Pure Zzzs Melatonin + Chamomile & Lavender Gummies had 163% more melatonin than was listed on the label, and Pure Zzzs Nightly Sleep Tablets had 150% more melatonin. *Id*.

Calderon alleges that if Pure Zzzs were reasonably dosed, the amount of melatonin at the end of the shelf life would be materially the same as the claim on the label, i.e., close to 100% of the claimed amount. *Id*. at ¶ 22. Calderon alleges, however, that Pure Zzzs melatonin has "substantially more melatonin than needed to meet the labeling claim throughout the shelf life." *Id*. Thus, Calderon claims that P&G uses false and misleading labeling and overcharges millions of consumers. *Id*. at ¶¶ 15, 34.

3

Calderon asserts claims on behalf of herself and on behalf of nationwide, multi-state, and Illinois-based classes.[1] She brings claims under the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) (Count II); the state consumer protection laws of California, Connecticut, Maryland, Missouri, and New York (Count I); and for unjust enrichment or quasi-contract (Count III). Calderon also seeks class-wide injunctive relief. P&G moved to dismiss all of Calderon's claims.

## II.  Standard

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] all well-pleaded facts as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Lax*, 20 F.4th at 1181. However, the court need not accept as true "statements of law or unsupported conclusory factual allegations." *Id.* (quoting *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021)). "While detailed factual allegations are not

---

[1] Calderon brings claims on behalf of a class comprised of: a nationwide class of all persons who purchased Pure Zzzs Melatonin in the United States during the applicable statute of limitations, a multi-state consumer protection subclass of all persons who purchased Pure Zzzs Melatonin in California, Connecticut, Illinois, Maryland, Missouri and New York, and, an Illinois subclass of all persons who purchased Pure Zzzs Melatonin in Illinois during the applicable statute of limitations. Dkt. 22 at ¶¶ 39, 49.

necessary to survive a motion to dismiss, [the standard] does require 'more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action to be considered adequate.'" *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019) (quoting *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Deciding the plausibility of the claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## III.   Analysis

P&G argues that the complaint should be dismissed because (1) Calderon's claims are preempted by FDA regulations; (2) even if not preempted, Calderon fails to state a claim under ICFA; (3) Calderon does not have standing to assert claims based on all Pure Zzzs products; and (4) Calderon lacks standing to seek injunctive relief.

### A. Calderon's Standing to Assert Certain Claims

The Court first addresses whether Calderon can bring claims based on all Pure Zzzs products. Calderon alleges that in 2020 she purchased "a bottle of Pure Zzzs Nightly Sleep," Dkt. 22 ¶ 37. She does not dispute that she never purchased the Pure Zzzs Melatonin + Chamomile & Lavender Gummies. She argues that the products are similar because "melatonin as a key, active ingredient and [they] claim to have a specific amount of melatonin per serving." Dkt. 29 at 20. This is not sufficient. The

Court agrees with P&G that Calderon has standing to sue based only on the product she purchased.

Courts have held that plaintiffs cannot show an injury in fact if they "did not purchase th[e] product" in question. *Pearson v. Target Corp.,* No. 11 CV 7972, 2012 U.S. Dist. LEXIS 187208 at *1 (N.D. Ill. Nov. 9, 2012) (named plaintiff only had standing to represent a class of consumers who had bought the same dietary supplement he had); *see also Benson v. Fannie May Confections Brands, Inc.*, No. 17 CV 3519, 2018 U.S. Dist. LEXIS 32781 at *6 (N.D. Ill. Feb. 28, 2018). Here, Calderon expressly alleges that the Pure Zzzs products are sold in several varieties and have a specific (and different) amounts of melatonin per serving. Dkt. 22 at ¶ 16. This is not a case in which there are "no material differences relevant to the claims brought." *Carrol v. S.C. Johnsons & Son, Inc.*, No. 17-CV-05828, 2018 WL 1695421, at *4 (N.D. Ill. Mar. 29, 2018). The amount of overage is material in this case. Therefore, Calderon may proceed on her claims only as to the Pure Zzzs Nightly Sleep.

### B. Preemption

P&G argues that Calderon's claims are expressly preempted because the FDA permits overages. According to P&G, Calderon is trying to use state law to impose requirements on P&G that are "not identical to" federal labeling requirements. Calderon counters that the overages at issue are unreasonably excessive, meaning that P&G is violating the Federal Food, Drug, and Cosmetic Act (FDCA). This Court finds that P&G has not met its burden to show that Calderon's claims are preempted.

The FDCA expressly preempts state law claims that seek to impose manufacturing and labeling requirements for dietary supplements that are "not identical to" federal requirements of the same type. 21 U.S.C. § 343-1(a)(1).[2] P&G bears the burden of proof because preemption is an affirmative defense. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019); *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 309 (7th Cir. 2019). Dismissal is only appropriate when the "plaintiff pleads himself out of court by alleging facts sufficient to establish" the defense. *Sidney Hillman Health Ctr. v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (cleaned up).

The FDA permits reasonable overages of dietary supplements but only to ensure that the product "meets the amount specified on the label throughout the product's shelf life." *See* 21 C.F.R. § 101.36(f)(1); 72 Fed. Reg. 34752, 34884. In her complaint Calderon alleges that:

> an excess is not a 'reasonable excess' (and violates FDA regulations) if the excess is materially more than necessary to meet the amount specified on the label throughout the product's shelf life. [T]he FDA does not review and approve any particular overages for dietary supplements—the duty falls on manufacturers to assure compliance with the 'reasonable excess' limit. Here, [P&G] is violating that duty.

Dkt. 22 at ¶ 21. Thus Calderon claims that P&G failed to assure compliance with the FDA's "reasonable excess" regulation. This shows that she is seeking to "enforce a violation of the Act as a violation of state law." *Chavez v. Church & Dwight Co.*, No.

---

[2] "Not identical to" means that the state requirement imposes obligations concerning composition or labeling that are "not imposed by or contained in the applicable [federal statue or regulation]" or "[d]iffer from those specifically imposed by or contained in the applicable [federal statute or regulation]". 21 C.F.R. § 100.1(c)(4).

17 C 1948, 2018 WL 2238191, at *3 (N.D. Ill. May 16, 2018); *see also Gubala v. CVS Pharmacy, Inc.*, No. 14 C 9039, 2016 WL 1019794, at *4 (N.D. Ill. Mar. 15, 2016) ("Claims under state law that parallel the FDCA's requirements [] are *not* preempted.").

P&G argues that unlike in *Chavez*, this case does not involve allegations of "dangerous" and "severe" side effects. But the Court does not read *Chavez* as holding that a plaintiff in an overage case must allege "dangerous" and "severe" side effects to avoid preemption. Calderon does not make this argument; Calderon simply states that the excess is unreasonable as it contains more than is needed to meet the label declaration throughout the supplement shelf life. In addition, she claims, consumers do not "want to take random, uncontrolled amounts of a neurohormone that alters brain chemistry." *Id.* ¶ 12. Accepting the complaint's allegations as true at this stage, Calderon has "plausibly allege[d] a violation of the reasonable excess provision." *Chavez,* 2018 WL 2238191 at *5.

P&G unpersuasively relies on *Ochoa v. Church & Dwight Co.*, 2018 WL 4998293 (C.D. Cal. Jan. 29, 2018) and *Reyes v. McDonald's Corp.*, 2006 WL 3253579 (N.D. Ill. Nov. 8, 2006). Neither case binds this Court. And *Reyes* did not involve dietary supplements, a manufacturer of such supplements, or an overage claim. In *Ochoa,* which involved a claim of overage of folic acid in a supplement, the court found plaintiff's claim preempted by the FDA because she did *not* plead "that the excess. . . is unreasonable and not consistent with good manufacturing practices." 2018 WL 4998293 at * 5. By contrast, here, that *is* what Calderon alleges.

8

P&G next argues for preemption by pointing to Calderon's testing which P&G says did not adhere to the FDA's testing requirements. Because Calderon only tested two bottles of Pure Zzzs, only one of which was past the expiration date, P&G maintains that Calderon cannot draw any inference from the test results because the FDA requires testing of "a composite of 12 subsamples" for a finding of unreasonable excess. 21 C.F.R. § 101.36(f)(1). This requirement "allows for some variation in the nutrient content" and "rejects the requirement that every individual product be labeled in compliance." *Vital v. One World Co.*, 2012 WL 13029487 at *4 (C.D. Cal. 2012).

Calderon responds that P&G places too heavy of a burden on her at this stage with regard to testing because she need only plausibly allege a violation of the FDA regulations. Indeed other courts in this district have declined to dismiss a complaint based on the 12-subsample requirement. *See e.g. Gubala,* 2016 WL 1019794, at *8; *Carrol*, 2018 U.S. Dist. LEXIS 57052; *Muir v. NBTY, Inc.*, No. 15-cv-9835 2016 U.S. Dist. LEXIS 129494 at *22 (N.D. Ill. Sep. 22, 2016) (explaining that the 12-sample testing protocol is not a pleading requirement).[3] Therefore Calderon's test results can certainly be challenged at a later stage but it is sufficient for Calderon to rely on these results at the pleading stage.

For the reasons explained, Calderon's claims in this case are not preempted.

## C. Primary Jurisdiction

---

[3] P&G's reliance on *Chandler v. Ulta Beauty, Inc.*, No. 18-cv-1577, 2022 WL 952441 (N.D. Ill. Mar. 30, 2022) is also not persuasive. That was a securities fraud case not a consumer protection case and did not involve testing food or supplement products.

P&G alternatively requests that the Court stay this case and refer to the FDA the question of whether Calderon has alleged a violation of FDA's reasonable excess regulation. Primary jurisdiction is a "permissive doctrine that applies when resolving a claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Peerless Network, Inc. v. MCI Commc'ns Servs., Inc.,* 917 F.3d 538, 542 (7th Cir. 2019) (quotation omitted).

Courts are well-equipped to interpret FDA regulations concerning labeling and good manufacturing practices. *See Gubala*, 2016 WL 1019794, at *16 ("The Court is well qualified to interpret the regulations and to resolve matters regarding allegations of false and misleading representations."); *Slowinski v. Forces of Nature, Inc.*, No. 20-cv-2381, 2021 U.S. Dist. LEXIS 58098 at *11–12 (N.D. Ill. Mar. 26, 2021) (declining to abstain from considering the merits of the case under the primary jurisdiction doctrine); *City of Chicago v. Purdue Pharma L.P.,* 211 F. Supp. 3d 1058, 1065 (N.D. Ill. 2016) (same). In addition, P&G has not "identified any relevant proceedings to which this Court should defer." *Curran v. Bayer Healthcare LLC*, No. 17 C 7930, 2019 WL 398685, at *3 (N.D. Ill. Jan. 31, 2019) (cleaned up).

Thus, this Court declines P&G's request to relinquish jurisdiction under the primary jurisdiction doctrine.

### D. ICFA Claim

"To prevail on a claim under the ICFA, a plaintiff must plead ... that the defendant committed a deceptive or unfair act with the intent that others rely on the deception,

that the act occurred in the course of trade or commerce, and that it caused actual damages." *Benson,* 944 F.3d at 646 (quotation marks omitted). Conduct is deceptive "if it creates a likelihood of deception or has the capacity to deceive" a "reasonable consumer." *Id.* P&G argues that Calderon has failed to plausibly plead that she suffered actual damages from a deceptive act and that P&G committed a deceptive act with the intent that others rely on the deception. Dkt. 27 at 10. The Court finds that Calderon has stated an ICFA claim.

### i. Deceptive Conduct

Calderon sufficiently alleges deceptive conduct. To determine the likelihood of deception under the ICFA, courts apply a "reasonable consumer" standard. *Benson,* 944 F.3d at 646. "This requires more than a mere possibility that [a] label might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner." *Beardsall v. CVS Pharmacy, Inc.*, 2019 WL 1168103, at *3 (N.D. Ill. 2019) (citation omitted). Instead the standard "requires a probability that a significant portion of the general consuming public . . . acting reasonably in the circumstances, could be misled." *Id*.

Calderon alleges "[n]o reasonable consumer expects that a melatonin supplement has an unreasonable excess of melatonin, compared to what it is supposed to have." Dkt. 22 at ¶ 28. The Court does not agree with P&G's characterization that her theory relies solely on an allegation that consumers believed the product violated FDA regulations. Viewing Calderon's complaint as a whole, the reasonable inference is that P&G engaged in deceptive conduct because its excessive dosing results in

11

misleading products that do not meet the reasonable consumer's expectations that a dietary supplement be accurately labeled and dosed. Moreover, courts take a "practical and fact-intensive approach to consumer behavior," so how reasonable consumers understand a label is usually a question of fact not resolved on a motion to dismiss. *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 478, 483 (7th Cir. 2020).

### ii. Actual Damages

Calderon has also sufficiently alleged actual damages. A plaintiff must establish "actual damages" for an ICFA claim. *See Mashallah, Inc. v. W. Bend Mut. Ins. Co.,* 20 F.4th 311, 322 (7th Cir. 2021). To plead actual damages, a plaintiff must allege "actual pecuniary loss." *See Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010).

Calderon alleges that "[i]f a consumer selects a 2 mg dose, as opposed to a higher dose, this is because that consumer wants 2 mg and no more." Dkt. 22 at ¶ 31. She claims that she would not have purchased the product if she had known that it contained an excessive amount of melatonin. *Id.* ¶¶ 37, 52. This is enough to survive the motion to dismiss. *Curtis v. 7-Eleven, Inc.*, 2022 U.S. Dist. LEXIS 164850, *46 (N.D. Ill. Sept. 13, 2022) (plaintiff alleging she would not have purchased the product had she known the truth was enough to state a claim that plaintiff suffered actual damages); *Rudy v. Fam. Dollar Stores, Inc.*, 583 F. Supp. 3d 1149, 1160 (N.D. Ill. 2022) (explaining that "[n]umerous courts have permitted ICFA claims to proceed where, as here, a plaintiff claimed that defendant misled her as to the nature of the product she was buying, and she either paid more for the product than she otherwise would have or would not have purchased the product had she known the truth").

Calderon also alleges that "without accurate dosing and labelling, Pure Zzzs melatonin is worthless." Dkt. 22 at ¶ 35. As a result "the full economic injury here is the entire price of the Pure Zzzs Melatonin that Plaintiff and class members purchased." *Id*. In other words, unreasonably overdosed melatonin product would not sell in the market. *See Gershman v. Bayer HealthCare LLC*, No. 14-cv-5332-HSG, 2015 U.S. Dist. LEXIS 60835, *21–22 (N.D. CA May 8, 2015) (finding plaintiff alleged product is worthless as a stated claim for actual damages under the ICFA).

P&G argues that Calderon's damages theories "def[y] common sense." Dkt. 30 at 8. A damages theory based on paying a premium for a product when the consumer in fact wants *less* of a product appears counter intuitive. *Cf. Bonahoom v. Staples, Inc*., No. 20-cv-1942, 2021 WL 1020986 at *6 (N.D. Ill. Mar. 17, 2021) (damages based on product delivering less than the advertised capacity). Nevertheless, the Court will not parse Calderon's damages theories at this stage. It is sufficient at this stage that Calderon argues that as a result of P&G's misrepresentations, the product is worthless. *See Mack v. Amazon.com, Inc*., No. 22-cv-1310, 2023 WL 2538706 at *2 n.1 (W.D. Wash. Mar. 16, 2023) ("…they can still allege economic loss if they overpaid based on a misrepresentation.").

### E. Injunctive Relief

Finally, Calderon lacks standing to seek injunctive relief because she does not have a likelihood of *future injury*. *See Rice v. Dreyer's Grand Ice Cream, Inc.,* No. 21 C 3814, 2022 WL 3908665, at *2 (N.D. Ill. Aug. 30, 2022) (citations omitted) ("Because Rice is aware of the presence of vegetable oil in the product, he faces no risk of future

harm from being deceived by the failure of the product's front label to mention vegetable oil, and he therefore lacks standing to seek prospective injunctive relief."). Calderon asserts that she "could and would buy Pure Zzzs Melatonin again" if the product was accurately labeled (Dkt. 22 at ¶ 38). But this does not overcome the fact that she is now aware of P&G's alleged deceptive practices (s*ee Camasta,* 761 F.3d at 741), and fails to provide a "concrete basis to conclude that the plaintiffs will or must purchase the product again in the future and be deceived." *Geske v. PNY Techs., Inc.*, 503 F. Supp. 3d 687, 702 (N.D. Ill. 2020); *see also Chiappetta v. Kellogg Sales Co.*, No. 21-CV-3545, 2022 WL 602505, at *9-10 (N.D. Ill. Mar. 1, 2022) (dismissing request for injunctive relief).

The Court therefore dismisses the demand for injunctive relief.

### F. Unjust Enrichment

Under Illinois law an unjust enrichment claim alleges that defendant "unjustly retained a benefit to the plaintiff's detriment, and that the retention of the benefit violates fundamental principles of justice, equity, and good conscience." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011). Calderon argues that she pleads unjust enrichment in the alternative. Dkt. 29 at 19. It is "common to plead unjust enrichment claim in the alternative to other claims, and it requires no magic formula; the plaintiff need only provide adequate notice by stating a plausible claim." *United States v. Park*, 389 F. Supp. 3d 561, 580 (N.D. Ill. 2019). Calderon has alleged that P&G received an unjust benefit at the expense of her purchase of P&G's allegedly

false and misleadingly labelled product. Dkt. 22 at ¶¶ 61–65. This is sufficient to allege unjust enrichment.

## IV.    Conclusion

For the stated reasons, Defendant's Motion to Dismiss [27] is granted in part and denied in part.

E N T E R:

Dated: May 24, 2023

_____
MARY M. ROWLAND
United States District Judge

15